## Metropolitan Life Insurance Company v. National Life Insurance Company.

### Gen. No. 12,608.

1. REINSURANCE—*when liability under contract of, cannot be revived.* Where one party to a contract of reinsurance directs that the reinsurance policy be cancelled and such direction is concurred in, a revival of liability cannot be had without the concurrence of both parties to the contract of reinsurance.

2. INSURANCE POLICY—*may be cancelled by agreement, notwithstanding statutory provision for extended insurance.* Notwithstanding a statute, which by construction is a part of the contract itself, provides in the event of lapse the right to extended insurance shall exist, the parties may by agreement cancel such policy *in toto.*

Action of assumpsit. Appeal from the Superior Court of Cook County; the Hon. GEORGE A. DUPUY, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1905. Reversed, with finding of fact. Opinion filed July 13, 1906. Rehearing denied July 20, 1906.

**Statement by the Court.** Appellant sued appellee upon a policy of reinsurance issued February 28, 1899, by the Iowa Life Insurance Company of Chicago on the life of one Joseph R. Edwards for $5,000, to the Covenant Mutual Life Insurance Company of St. Louis, which latter company had February 10, 1899, issued two policies, each for $5,000, on the life of said Edwards, and by such reinsurance divided its responsibility on said policies with the Iowa. The Iowa company subsequently, May 4, 1900, disposed of its business to the National Life Insurance Company of Chicago, defendant in this suit, and the latter assumed the risks of the Iowa, including the said policy of reinsurance issued to the Covenant on the life of said Edwards.

Upon August 30, 1897, the Iowa had issued its policy for $10,000 on the life of George C. Hall, and on September 9, 1897, had divided its responsibility upon said policy by obtaining from the said Covenant a policy reinsuring the life of said Hall for $5,000. Upon the 31st of January, 1900, the said Covenant Mutual Life Insurance Company disposed of its business to the Metropolitan Life Insurance Company of New York City, plaintiff in this suit, which assumed all the risks of the Covenant, including the said policy of reinsurance issued by the latter to the Iowa. The result of these transactions was that defendant, the National, as successor to the Iowa, became liable to plaintiff for the $5,000 policy of reinsurance issued by the Iowa on the life of said Edwards; and the plaintiff, as successor to the Covenant, became liable to the National on the $5,000 policy of reinsurance issued by the Covenant upon the life of said Hall, in case of the death of the assured respectively, while said policies remained in force.

September 17, 1902, said Edwards died and the Metropolitan, as successor to the Covenant, paid the amount due on the policies of $10,000, held by the deceased, Edwards, to his executor, said policies having been kept in force. October 1, 1902, said Metropolitan furnished due proofs of the death of Edwards to the National as suc-

cessor to the Iowa, and demanded payment of the $5,000 policy of reinsurance issued by the latter and assumed by the National on the life of said Edwards. Payment was refused by the National, which claimed an offset against the Metropolitan.

October 2, 1901, said George C. Hall died and the National, as successor to the Iowa, became liable to pay to Pearl D. Hall, wife of the insured, the amount of the policy of $10,000 held by the deceased. At the same time the Metropolitan, as successor to the Covenant, became liable to pay to the National the amount due on the $5,000 policy of reinsurance issued by the Covenant and assumed by the Metropolitan on the life of said Hall, provided said policy of reinsurance remained in force and effect at that time. It is claimed by the Metropolitan, that its said policy of reinsurance was not in force and effect at that time, the contention being that said policy of reinsurance on the life of Hall had been cancelled by the National prior to Hall's death.

The Metropolitan sues the National to recover upon the policy of reinsurance for $5,000 issued on the life of Edwards and assumed by the National. The latter concedes its liability to plaintiff on this policy, but claims as an offset that the plaintiff is liable to the National for a like amount upon the policy of reinsurance issued on the life of Hall and assumed by the Metropolitan. It was stipulated by the parties before the trial that "if the defendant (the National) shall prove upon the trial of the said case such a payment or tender to the plaintiff of the fifth annual premium (falling due in the year 1901) on the said policy within such time and in such manner as rendered the plaintiff liable on the said policy under the law, or shall show on the trial that a payment or tender of the said fifth premium was unnecessary as a matter of law to render the plaintiff liable on the said policy, then the plaintiff is liable upon the said policy to the defendant in the sum of five thousand dollars ($5,000) with interest thereon at five per cent. per annum from the said 2nd day of October, unless the plaintiff was

released from liability on the said policy by reason of facts and circumstances which occurred subsequently to the 6th day of October, 1900, and which the plaintiff may show upon the trial of the said case by any competent evidence that it may desire to offer."

The cause was submitted to the court, a jury having been waived. The court held as propositions of law, that "the Hall policy of reinsurance was in force at the time of the death of Hall, and plaintiff was liable thereon to the defendant"; that "under the contract of reinsurance sued upon by the defendant, the time within which the defendant had a right to pay the 1901 premium had not expired at the time of the death of George C. Hall"; that "the payment or tender of the fifth annual premium was wholly unnecessary, Hall having died before the time of payment expired." Judgment was accordingly entered in favor of the defendant for $175, the excess of the defendant's alleged set-off on the Hall policy over plaintiff's claim on the Edwards policy.

HOYNE, O'CONNOR & HOYNE, for appellant.

L. A. STEBBINS, for appellee.

MR. JUSTICE FREEMAN delivered the opinion of the court.

The liability of appellee to appellant upon the Edwards policy of reinsurance being conceded, the only question for determination is, whether appellant is in like manner liable to appellee upon the Hall policy of reinsurance, which alleged liability appellee seeks to offset against appellant's claim.

The Metropolitan—appellant here and plaintiff in the trial court—contends that its liability upon the Hall policy was terminated by the cancellation of said policy at the request of appellant prior to the death of said Hall. This contention is based upon the following state of facts. Some time in August, 1901, the Metropolitan as successor to the Covenant forwarded to the National—appellee here and defendant in the trial court—as successor to the Iowa, the

usual renewal receipt for the premium which by the terms of said reinsurance policy would be due and payable from the National to the Metropolitan upon the 9th of September following. Instead of paying the premium called for by the receipt thus forwarded, the National retained the receipt until the 17th of September, 1901, and then returned it with the word " Lapse," written with a blue pencil in large letters across its face. There is evidence tending to show that the National had taken this method of cancelling other policies of reinsurance which as successor to the Iowa it held against the Metropolitan as successor to the Covenant. At the time when the Metropolitan assumed the risks of the Covenant there were twenty-four of the latter's policies of reinsurance outstanding and held by the Iowa, which passed to the National as successor. When the Hall premium receipt was thus returned, all of these policies except four had been cancelled by direction of the National and three of the remainder have since been cancelled. The method pursued by the National had been either to return the premium receipt with a letter directing cancellation, or else to return the receipt marked " Lapse " or " Lapsed," with or, as in the Hall case, without any additional communication. In all cases where the receipt was returned without letter of explanation, the word " Lapse " or " Lapsed" was written across its face. There is evidence tending to show that there were four of these cases other than the Hall case—although appellee's counsel admits only one—in which direction to cancel the policy was thus given. In each case such direction was accepted by the Metropolitan as an order to cancel. In some of the cases so cancelled the original or reinsured policies had lapsed, but in others they were still in force, the National merely directing in this way the reinsurance policy to be cancelled and thereafter carrying the whole risk itself. or reinsuring elsewhere. There is evidence tending to show that the word "lapse " is used among insurance men in the sense of " cancel." In the Hall case, over which the present controversy has arisen, when the receipt was returned

thus marked by the National, the Metropolitan marked it
" N. G." meaning " no good," proceeded to charge the pol-
icy of reinsurance off its books and treated the contract as
terminated.

It is insisted by the Metropolitan that the return of the
renewal receipt so marked was a direction, accepted and
acted upon by the company to cancel the policy of reinsur-
ance in controversy; that the cancellation thus became an
accomplished fact by mutual agreement on the 17th of
September, 1901,—the date of the return; that the contin-
gent liability of the Metropolitan under said policy was
then terminated and that the National had thus abandoned
its right to renew the policy for another year, together
with all rights thereunder. It is probable that this would
have been conceded to be the understanding of both parties
and that no controversy would have arisen, except for the
fact that the death of Hall occurred October 2, 1901, about
fifteen days after the return of the renewal receipt with
directions to "lapse," and while the National was still lia-
ble on its own policy to Hall, which made it desirable for
appellee to undo its previous act and share the loss with
appellant if possible. Upon the 8th of October, 1901, six
days after the death of Hall, the National mailed to the
Metropolitan a check for $54.32, the amount of the premium
which would have been due upon the said policy of rein-
surance by its terms, had said policy remained uncancelled
and in full force and effect. This was the first communi-
cation on the matter received from the National by the
Metropolitan since the return of the renewal premium re-
ceipt. It contained no reference to Hall's death, of which
the Metropolitan was still ignorant. The latter, therefore,
not understanding evidently what the National intended
by such remittance, wrote as follows: "The renewal· re-
ceipt for this premium was returned by you last month for
cancellation. Kindly advise us whether or not you are de-
sirous of reviving the policy." Thereupon the National
replied that Mr. Hall's death had occurred before the expi-
ration of the time when payment of premium could be

made on the policy, and that it had forwarded the premium "in pursuance of paragraphs 4 and 5 of the reinsurance contract entered into" between the Covenant and the Iowa, dated May 1, 1896. These paragraphs need not be quoted at length. It suffices to say that applied to the Hall policy in controversy the contract required the Metropolitan to cause the renewal premium receipt to be forwarded to the National before the first day of September, 1901, that the renewal premium itself should be payable by the latter twenty days after demand made upon it in writing, and that such demand should not be made before October 1, 1901. If therefore the National, instead of directing the cancellation of the Hall reinsurance, had merely failed to pay promptly the renewal premium, the Metropolitan could have made demand therefor on or after October 1, 1901, and the National in the first event would have been obliged to pay on or before October 20, 1901, in order to renew and extend the policy another year. The agreement further provided that payment so made should "be deemed equivalent to payment on the day on which the same became due," which was September 9, 1901, in the present case, and further that "in all such cases the company receiving the money shall be bound by any death on which the original company is bound, notwithstanding the reinsurance premium shall not have been paid at the time of death." The reinsurance policy in controversy itself provided that it should be subject to the terms of said agreement of May 1, 1896, and for payment of the amount, by said policy reinsured, upon proofs of the death of said George C. Hall, "provided such death shall occur on or before 12 o'clock noon on the 9th day of September, A. D. 1898." It also provided that it might be "renewed and extended upon like conditions" for the term of ten years, upon payment of the premium mentioned, "on or before 12 o'clock noon of the 9th day of September in each year during said term." Thus by its terms the policy expired at noon of September 9th of any year unless renewed and extended by payment of premium on or before that date,

except that by the reinsurance agreement of May 1, 1896, payment made on or before October 20, 1901, would have the same effect in renewing and extending the reinsurance. If not so renewed and extended, it must be regarded as having lapsed at the time fixed in the policy, September 9, 1901.

Appellee's counsel contends that the word "lapse" written on the returned receipt did not mean "cancel" and should not be so interpreted; that if it is to be so construed, the National had a right to change its mind and withdraw the cancellation after Hall's death and before the expiration of the time within which, but for the alleged cancellation, payment of premium could have been made renewing and extending the policy; that there was no consideration to the National for releasing its rights by such cancellation, that the policy was a Missouri contract governed by the laws of that state, and that a letter of the Metropolitan of October 18, 1901, demanded or invited proofs of loss and so waived the alleged cancellation.

It is argued that the "lapsing" of a policy is practically automatic, and that the word as written on the face of the returned renewal receipt merely meant that the policy was to be allowed to lapse for non-payment of premium at the expiration of the time, not sooner than October 20, 1901, in case the National should not pay by that time; that the meaning was the National would hold the Metropolitan on the policy up to the expiration of the time when renewal premium could be paid and then allow the reinsurance to "lapse." The evidence does not sustain this contention. If that had been the intention there was no need to return the receipt at all. The previous practice of the parties, the action taken by the Metropolitan before the death of Hall, the letter in which the Metropolitan referred to the return of the receipt "for cancellation" and, ignorant of the death of Hall, interpreted the action of the National in sending the check to a possible desire "of reviving the policy," all tend to show the intent and understanding of both parties to cancel the policy,

until by the death of Hall it became an object for the National to disclaim what appears to have been its obvious purpose in returning the receipt with directions to "lapse."

Nor do we think the provision holding the reinsuring company bound by a death occurring during the time limited for renewals, has any application in the case. When the receipt was returned the policy had already expired September 9, 1901, by its terms, subject only to be "renewed and extended" at any time before October 20, 1901, or later. During these "days of grace" the Metropolitan would have remained bound under ordinary conditions in case of Hall's death, even if the reinsurance premium was not paid before such death. This part of the agreement must be deemed to relate to cases where there might be mere delay in paying the renewal premium, to policies still alive, not to policies where as here the National by returning the receipt so marked announced its purpose before Hall's death and before liability had accrued, not to renew in any event, had been taken at its word and the policy cancelled in accordance with its direction. When the National informed the Metropolitan that it would not renew and when by return of the receipt it refused to pay the renewal premium and asked for cancellation, it waived its rights under the agreement to "renew and extend." When the Metropolitan accepted such waiver and cancelled the policy, the minds of the parties met in agreement that liability under the policy on the one side and payment of premium on the other were alike terminated. Each agreement was in consideration of the other. This was two weeks before Hall's death, and when that death occurred the National had put it out of its power to revive the extinct liability without the consent of the Metropolitan. See Walters v. St. Jo. F. & M. Ins. Co., 39 Wis. 489—492.

As to the authority of appellee's cashier to return the receipt as was done, we are of opinion that whether he possessed express authority or not he was in the habit of representing the company in such ways as to justify the

conclusion by the outside world that he possessed the authority he was allowed by the company to exercise.

It is contended by appellee's counsel that the policy in controversy issued by the Covenant Mutual Life Insurance Company, having its principal office in St. Louis, was a Missouri contract subject to the statutes of that state. The evidence is by no means satisfactory as to whether the policy was sent by mail from St. Louis directly to appellee's predecessor or delivered in Chicago by the insurer's representative and the premium paid here. The statute of Missouri provides that: "No policy of insurance * * * shall, after payment upon it of two full annual premiums, be forfeited or become void by reason of the non-payment of premium thereon, but shall be subject to the following rules of commutation, to wit"; the rules being to the effect that three-fourths of the net value of the policy computed as the statute provides shall be applied as a single premium to purchase extended insurance, and the policy shall be in force during the term so extended. It is apparently true, as stated by appellant's counsel, that there is no evidence in the record to show what would be the net value of the policy in question, the evidence in that regard having been based, so far as the record shows, upon a mistake or misapprehension as to the age of the assured. Whatever may be the effect of this evidence, however, whether disregarded or not, we are unable to perceive any reason why, assuming that the Missouri statute is applicable to the policy in question, that policy could not be cancelled by the parties to it. In the case Insurance Co. v. Johnston, 105 Fed. Rep. 286–287, the court said: "The unmaking of a written or oral contract is of course within the power of those who made it. The parties who make the contract can rescind it, but it requires to accomplish this the same concurrence of their wills which it required to make the contract. Mutual release from the old contract is an adequate consideration for the rescission. This doctrine is applicable to a contract of insurance." It was held in that case that the contract of insurance had been

rescinded by mutual agreement. As we have said, we regard the return of the renewal premium receipt by the National as an election to rescind the contract, which is shown to have been accepted and concurred in, not only by the evidence showing such concurrence, in steps taken by the Metropolitan to cancel the contract, but by the letter before quoted from, in which the Metropolitan asked to be advised upon receipt of the National's letter of October 8, 1901, enclosing check for premium, "whether or not you are desirous of reviving this policy." This letter was equivalent to a notification of the Metropolitan's acceptance of the National's proposition or direction to cancel, made in the letter of September 17th returning the receipt with instructions to "lapse." It was sent before the Metropolitan was informed of the death of Hall. It was not written in consideration of that fact nor influenced by it. We regard the cases, Mut. L. Ins. Co. v. Phinney, 178 U. S. 327; Mut. L. Ins. Co. v. Sears, 178 U. S. 345; Mut. L. Ins. Co. v. Hill, 178 U. S. 347; Mut. L. Ins. Co. v. Allen, 178 U. S. 351, as in point upon the proposition that the policy could be terminated by the parties, whether the Missouri statutes be deemed applicable or not.

We do not concur in the contention that appellant's letter of October 18, 1901, was a waiver of any alleged forfeiture, if such the agreement of the parties to cancel the policy can be called.

Counsel have furnished us with elaborate and lengthy briefs and arguments on both sides. It is impossible within appropriate limits to follow them in detailed discussion of all the questions presented. In view of the conclusions stated we deem it unnecessary. For the reasons indicated the judgment of the Superior Court must be reversed with the finding that the Hall reinsurance policy in question was cancelled by mutual agreement of the parties thereto before any liability thereon accrued, and judgment will be entered here in favor of appellant for the amount due on the Edwards policy.

*Reversed, with finding of fact.*